**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| SHAUNEE O.,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | No. 25-cv-70-LTS<br><br>**REPORT AND RECOMMENDATION** |

---

Shaunee O. ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") in denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed**.

## *I. BACKGROUND*

Claimant was born in 1973. (AR[1] at 224.) She is a high school graduate and attended two years of college. (*Id*. at 229.) Claimant allegedly became disabled due to fibromyalgia, erosive osteoarthritis, plantar fasciitis, irritable bowel syndrome, renal cysts, headaches/migraines, asthma, premature ventricular contraction, depression, and anxiety. (*Id*. at 228.) Claimant's onset of disability date is December 1, 2017. (*Id*. at 79.) On February 17, 2023, Claimant protectively filed his application for DIB. (*Id*. at 15, 78.) Her claim was denied originally on November 16, 2023 (*id*. at 15, 78-88) and

[1] "AR" cites refer to pages in the Administrative Record.

was denied on reconsideration on May 29, 2024. (*Id.* at 15, 89-100.) A hearing was held on December 11, 2024, with Claimant and her attorney David Porter appearing by online video before Administrative Law Judge ("ALJ") Christina Young Mein. (*Id.* at 38-77.) Vocational Expert ("VE") Marsha Storozyszyn also appeared at the hearing telephonically. (*Id.*) Claimant and the VE both testified at the hearing. The ALJ issued an unfavorable decision on December 23, 2024. (*Id.* at 15-31.)

Claimant requested review and the Appeals Council denied review on March 19, 2025. (*Id.* at 1-3.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On May 15, 2025, Claimant timely filed his Complaint in this Court. (Doc. 1.) On September 23, 2025, all briefing was completed, and the Honorable Leonard T. Strand, United States District Court Judge, referred the case to me for a Report and Recommendation.

## *II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant has a disability when, due to physical or mental impairments, the claimant:

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work,

lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability, the Commissioner follows a five-step sequential evaluation process. *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 404.1572(a)-(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 404.1520(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also* 20 C.F.R. § 404.1521(b). These include:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to

> supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is the most an individual can do despite the combined effect of all his or her credible limitations. *Id.* § 404.1545(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 404.1560(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work

exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

***A. The ALJ's Findings***

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. Initially, the ALJ determined that Claimant met the insured status requirements through September 30, 2027. (AR at 17.) The ALJ then applied the first step of the analysis and determined that Claimant had engaged in substantial gainful activity from December 2017 through August 2021. (*Id.*) Also at step one, the ALJ determined that "there has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity" and the "remaining findings address the period the claimant did not engage in substantial gainful activity." (*Id.* at 18.) At the second step, the ALJ concluded from the medical evidence that Claimant suffered from the following severe impairments: fibromyalgia, obesity, asthma, osteoarthritis, anxiety disorder, depressive disorder, and disorder of the spine. (*Id.*) At the third step, the ALJ found that Claimant did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.* at 19.) The ALJ evaluated Claimant's claims under listing 1.15 (disorders of the spine), 1.16 (lumbar spinal stenosis), 3.03 (asthma), 11.04 (vascular insult to the brain), 12.04 (depressive disorders), 12.06 (anxiety disorders), 14.02 (systemic lupus erythematosus), and 14.09D (inflammatory arthritis). (*Id.* 19-20.) The ALJ also evaluated Claimant's obesity in accordance with SSR 19-2p. (*Id.* at 19.) Further, the ALJ determined that Claimant did not satisfy either the "paragraph B" or "paragraph C" criteria. (*Id.* at 19-21.) At the fourth step, the ALJ determined that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit six hours and stand or walk six hours in an eight-hour workday. She can occasionally balance (as

> defined in the Selected Characteristics of Occupations). She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She cannot work around unprotected heights or hazardous, unshielded, moving machinery. She can frequently handle and finger. She can understand, remember and carry out simple instructions. She can occasionally interact with coworkers and supervisors, but cannot interact with the public in the performance of job duties.

(*Id.* at 21.) Also at the fourth step, the ALJ determined that Claimant was unable to perform her past relevant work. (*Id.* at 29.) At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy Claimant could perform, including housekeeping cleaner, collator operator, and routing clerk. (*Id.* at 30.) Thus, the ALJ concluded that Claimant was not disabled. (*Id.* at 31.)

### *B. The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted); *see also Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.") (Quoting *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012)). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it]

been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). However, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

## *III. DISCUSSION*

### *A. Parties' Arguments*

Claimant argues that the ALJ failed to "consider all of the Claimant's impairments in combination." (Doc. 6 at 24.) Specifically, Claimant argues that "[w]hile the ALJ acknowledged that she has severe impairments, [the ALJ] disregarded [Claimant's] diagnoses of lower extremity edema, foot and heel pain, knee pain including the presence of Baker's cyst, palpitations, precordial pain, anemia, dyspnea, dizziness, vision disturbance, acute cystitis, paresthesia, and osteoporosis." (*Id.*) According to Claimant, the record "repeatedly cites these conditions as ongoing problems for [Claimant]." (*Id.*

at 25.) Claimant notes that the ALJ determined she had the "severe impairments, including fibromyalgia, obesity, asthma, osteoarthritis, anxiety disorder, depressive disorder, and disorder of the spine." (*Id.*) Claimant contends that, "[w]hile these conditions are certainly severe, had the ALJ considered the forementioned conditions in combination with them in rendering her adverse decision, an even more significant medical history would have been presented for her to consider." (*Id.*) Claimant also argues that the ALJ "erred in her analysis and credibility findings in regard to the Claimant's subjective allegations of pain." (*Id.* at 26.) Further, Claimant also argues that the ALJ failed to properly assess her RFC. (*Id.* at 28.) Claimant maintains that "the medical evidence of record clearly does not support a conclusion that she would be capable of performing a limited range of light work." (*Id.* at 29.) For example, Claimant asserts that the ALJ failed to properly consider the opinions of Dr. Ashley Freeman, and consultative mental health examiner. (*Id.* at 29-30.) Claimant also asserts that the ALJ failed to properly consider the opinions of her primary treating physicians, Dr. Michael Wallace, Dr. Mathew Reid, Paula Stultz, A.R.N.P., and Anne Dempewolf, PA-C in determining Claimant's RFC. (*Id.* at 30-31.) Lastly, Claimant argues that the ALJ failed to "fully and fairly develop the medical record." (*Id.* at 31.) Claimant maintains that "[b]ased upon the corroborative medical evidence of record, if the ALJ had any doubts regarding [Claimant's] condition, she could have ordered additional consultative examinations to further evaluate [Claimant's] plantar fasciitis, migraine headaches, premature ventricular contractions, recurrent urinary tract infections, kidney cysts, and irritable bowel syndrome, and the resulting effects on her ability to function in the workplace on a regular and sustained basis." (*Id.* at 31.)

The Commissioner argues that the ALJ "properly considered Plaintiff's impairments in combination." (Doc. 8 at 6.) Specifically, the Commissioner argues that:

> The ALJ's decision shows that she considered the combined effects of Plaintiff's impairments (Tr. 15-31). The ALJ clearly stated that he considered Plaintiff's combined impairments at step two and three and in assessing Plaintiff's RFC (Tr . 16-19, 21-29). She recognized that her sequential analysis had to include consideration of Plaintiff's impairments or combination of impairments (Tr. 16), and she noted that, in determining Plaintiff's RFC, she "must consider all of the claimant's impairments, including impairments that are not severe" (Tr. 16-17). Further, the ALJ stated that, in reaching her RFC finding, she considered "the entire record" (Tr. 21, 27), and evaluated "all symptoms" (Tr. 22). This language demonstrates that the ALJ considered the combined effect of Plaintiff's impairments.

(*Id.* at 6-7.) The Commissioner also argues that the "ALJ properly evaluated Plaintiff's symptoms and substantial evidence supports the ALJ's RFC finding." (*Id.* at 10.) The Commissioner contends that the ALJ properly evaluated Claimant's credibility and subjective allegations of pain. (*Id.* at 10-12, 14.) The Commissioner asserts that the ALJ properly considered Dr. Freeman's opinions. (*Id.* at 12-13.) Further, the Commissioner argues that the ALJ properly considered the opinions of Claimant's treating sources, including Dr. Wallace, Ms. Stultz, Dr. Reid, and Ms. Dempewolf. (*Id.* at 13-14.) Finally, the Commissioner argues that the ALJ "fully and fairly developed the record." (*Id.* at 15.) The Commissioner argues that the record "was reasonably complete and contained sufficient evidence from which the ALJ could make an informed decision" and therefore, "the ALJ was not required to obtain further evidence." (*Id.* at 16.)

### *B. Pertinent Medical Evidence*

#### *1. Dr. Freeman*

On November 8, 2023, Dr. Freeman performed a Psychological Consultative Evaluation for Claimant. (AR at 2285-89.) Dr. Freeman noted that Claimant alleged disability due to: "fibromyalgia, erosive osteoarthritis, plantar fasciitis, irritable bowel syndrome, renal cysts, headaches/migraines, asthma, premature ventricular contraction,

depression, [and] anxiety." (AR at 2285.) Claimant described her mental and emotional health to Dr. Freeman as follows:

> When asked about any previous diagnoses, [Claimant] stated, "I have generalized anxiety and situational depression. I think it's because of the situations I've been in. I feel like that makes me depressed. I feel more depressed and hopeless when things are rough. My depression makes me tired and not want to be around people. I don't want to socialize or get out of bed." [Claimant] reported feeling down, depressed, and hopeless almost every day of the week for most of the day.
>
> When asked how often she feels down and depressed, she stated, "Every day I struggle to get up and do functional things but I don't always know if it's from my physical things or my mental." She endorsed little interest or pleasure in doing things such as socializing. She endorsed difficulty concentrating. She endorsed sleep disturbance and stated, "Again, I can't tell if it's physical or mental but I sleep for only like three hours and then I'm up and then I go back to sleep and I do that almost all day long. I'm tired all the time." She endorsed feelings of guilt but not worthlessness. She denied suicidal ideation.
>
> Regarding anxiety, she stated, "My anxiety is daily and it can range from where I have ruminating thoughts. I'll re-think about situations where I should have done something different and that sometimes keeps me from sleeping." She endorsed frequent worrying about a variety of topics with difficulty controlling the worry.

(*Id.* at 2286.) Claimant reported that she last worked in 2023 at Aveanna Home Health Care, she stated that "I missed a lot of work from being sick. The anxiety was horrendous. I felt like people were picking on me at work and I'm not sure how much of that is true. It became so intense that it was hard for me to be there. . . . I kept backing off my hours until I was only working one day a week because of physical ailments, fatigue and exhaustion, more physical problems." (*Id.* at 2287.) On her current ability to work, Claimant stated, "I feel like it's almost impossible. I feel like I can only be awake for a couple hours before needing a nap. I get exhausted after physical activity.

Even mental work is tiring but physical work is really tiring." (*Id.*) Claimant described her current activities of daily living as follows:

> • Meal preparation: She can prepare a simple meal.
> • Shopping: She can shop alone.
> • Laundry: She can do laundry.
> • Maintaining/cleaning the home: She can maintain the home.
> • Grooming/hygiene: She stated, "I can. Some days it's a struggle but I make myself get up and however regularly. It helps keep my mental status from getting even worse."
> • Use of transportation/Driving: She has a driver's license and denied difficulty driving.
> • Money management: She can manage money.
> • Medication management: She can manage her medications.

(*Id.*) Dr. Freeman diagnosed Claimant with unspecified depressive disorder and generalized anxiety disorder. (*Id.* at 2288.) Dr. Freeman opined that Claimant's prognosis was "guarded." (*Id.* at 2289.) Dr. Freeman opined that the data of evaluation suggested the following:

> • Ms. Olson currently possesses the mental capacity to perform simple and repetitive tasks as well as complex and detailed tasks.
> • She should not experience impairment in consistent job performance due to psychosis or a thought disorder.
> • Ms. Olson should not require additional or special supervision.
> • She was able to carry out instructions, maintain attention, concentration, and pace during the current evaluation other than performing below normal limits on digit span.
> • She may have some impairment interacting appropriately with supervisors, co-workers, and the public due to anxiety. However, she accepted instructions without difficulty from this evaluator during the current evaluation.
> • She may experience some interruptions in her ability to complete a normal workday or workweek due to anxiety, depression, and difficulty coping with her various medical conditions.

- She may experience impairment dealing with the usual stresses encountered in competitive work.

(*Id.*)

### 2. *Dr. Wallace*

On August 5, 2021, Dr. Michael Wallace provided a medical evaluation for Claimant's employer, related to FMLA leave. (AR at 2977-79.) Dr. Wallace diagnosed Claimant with depression and anxiety. (Id. at 2977.) Dr. Wallace indicated that Claimant was not unable to perform any of her job functions. (*Id.*) However, Dr. Wallace noted that presently Claimant was having difficulty answering phones due to an inability to focus/concentrate. (*Id.*) Dr. Wallace opined that Claimant's depression and anxiety symptoms had been worsening over the past month. (*Id.*) Dr. Wallace also noted that daily pain was affecting Claimant's ability to focus, concentrate and perform her job. Dr. Wallace stated that Claimant would be "undergoing treatment . . . for the next 7 days" and her medications would be adjusted. (*Id.*) Dr. Wallace opined that Claimant may need to miss additional work if her focus and concentration lead to an inability to "perform tasks of her job" and she would be evaluated weekly. (*Id.* at 2978.)

### 3. *Paula Stultz, ARNP*

On July 26, 2021, Ms. Stultz provided a medical evaluation for Claimant's employer, related to FMLA leave. (AR at 2982-84.) Claimant was evaluated for gastrointestinal and abdominal pain. (*Id.* at 2982.) Ms. Stultz noted that Claimant could not perform her job duties at times due to difficulty concentrating "when pain is significant" and when frequent and urgent restroom breaks are needed. (*Id.*) Ms. Stultz also noted that Claimant tested positive for small intestinal bacterial overgrowth. (Id.) Claimant was treated with an antibiotic for 14 days, with a possible additional 14 days. While her symptoms wax and wane, Ms. Stultz opined that when Claimant's pain is "significant enough" it makes concentration and being at her desk difficult. (*Id.*) Ms.

Stultz noted that "[o]nce cleared up [and] no other concurrent GI issue occurring, there should be no flare ups or reason [for Claimant] to be home due to GI concerns." (*Id.* at 2983.) Ms. Stultz concluded that Claimant should be allowed time off "if [abdominal] pain [is] severe [and] episodes of frequent/urgent restroom breaks are significant as well. Please allow [Claimant] to leave early or arrive late as needed for same concerns." (*Id.*) Ms. Stultz opined that "[t]he hope is once antibiotic treatment is completed (up to 1 month), symptoms [and] infection will be eradicated." (*Id.*)

***4. Dr. Reid***

On April 26, 2021, Dr. Reid provided a medical evaluation for Claimant's employer, related to FMLA leave. (AR at 2992-94.) Dr. Reid diagnosed Claimant with chest wall pain which was the result of a fall on April 12, 2021. (*Id.* at 2992.) Dr. Reid noted that Claimant's pain "increases when raising arms." (*Id.*) Dr. Reid limited Claimant's work to 6 hours maximum until April 22, 2021. (*Id.*)

***5. Anna Dempewolf, PA-C***

On January 22, 2021, Ms. Dempewolf provided a medical evaluation for Claimant's employer, related to FMLA leave. (AR 3018-20.) Ms. Dempewolf diagnosed Claimant with migraine headaches. (*Id.* at 3018.) Ms. Dempewolf noted that Claimant reported that her migraines cause "vision deficit, nausea, [and] severe head pain." (*Id.*) Claimant also reported that her migraines require "rest, darkness, medication, sleep and up to 24 hours recovery[.]" (*Id.*) Ms. Dempewolf opined that Claimant would have a migraine episode 1-2 times per month, lasting up to 24 hours. (*Id.* at 3019.)

***C. Relevant Law***

The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence for determining a claimant's RFC includes "medical records, observations of

treating physicians and others, and an individual's own description of his [or her] limitations." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007).

The ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). "There is no bright line rule indicating when the [ALJ] has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

Under the rules articulated in 20 C.F.R. Section 404.1520c, when determining the persuasiveness of a medical opinion, no such opinion is automatically given controlling weight. 20 C.F.R. § 404.1520c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* § 404.1520c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." Id. § 404.1520c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

Supportability concerns the internal consistency that a source's opinion has with the source's own findings and notes. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Consistency concerns the external consistency that the source's opinion has with the findings and opinions of other sources. "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2).

Additionally, when assessing a claimant's credibility, "the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). In *Polaski*, the Eighth Circuit stated that:

> The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions.

739 F.2d at 1322; *see also* SSR 16-3P (S.S.A.), 2017 WL 5180304, at *7-8 (outlining factors nearly identical to the factors found in *Polaski* for evaluating the intensity, persistence, and limiting effects of an individual's symptoms). An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). The ALJ, however, may not disregard "a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility

determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Igo*, 839 F.3d at 731 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

***D. Analysis***

In her decision, the ALJ addressed Claimant's impairments which she determined were nonsevere:

> In addition, the record reflects GERD, hypertension, migraines, history of plantar fasciitis, renal cysts, intermittent periventricular contractions, urinary tract infections, and irritable bowel syndrome (IBS), all of which are generally well-managed with conservative treatment, not vocationally relevant, and/or not discussed as a significant source of functional limitation in the record. (E.g., Ex's 15F, 17F/89, 22F/26). I have considered the record and find these conditions individually are non-severe, and when considered singly and/or in combination with other impairments, do not result in a greater degree of functional limitation than stated in the residual functional capacity defined below. (20 CFR 404.1523; see SSR 85-28).

(AR at 18-19.)

The ALJ also thoroughly addressed Claimant's mental health impairments:

> After considering the entire record, I find the claimant has mild limitations understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations concentrating, persisting, or maintaining pace; and moderate limitations adapting or managing oneself. These findings are supported by and consistent with the record.
>
> The claimant has mild limitations understanding, remembering, or applying information because she had some difficulty remembering specific dates and details during a consultative examination, and she recalled two of three words after a five-minute interval. However, she denied needing reminders

to take medications, to take care of her personal needs, or to go places. She also was able to recall events from the previous day and events from the past during a consultative examination as well as recall three of three words immediately. She can also do things like drive, operate household appliances, and complete forms, and she is not diagnosed with a cognitive or intellectual disorder. (E.g., Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4).

The claimant has moderate limitations interacting with others because she has daily anxiety and anhedonia that interfere with social activities. However, she reported having friends and visiting family. She interacted appropriately with treating sources and maintains appropriate hygiene/grooming and eye contact. She can also visit public places. (E.g., Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4).

The claimant has moderate limitations concentrating, persisting, or maintaining pace because she ruminates, worries, and feels depressed and anxious, which interferes with concentration and completing tasks. However, she was able to concentrate and maintain cognitive control while spelling world correctly forward and backwards. She made no mistakes while performing serial threes. She also accurately performed arithmetic calculations, including simple addition, subtraction, and multiplication. She can also do things like drive and shop, and she is not described as distractible in the record. (E.g., Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4).

The claimant has mild limitations adapting or managing oneself because she has frustrating medical conditions that require daily medication management, and she also has difficulty managing stress and coping with stress and change. However, she cares for herself independently and also provides care for an adult son who is described in the record as having autism and bipolar disorder. She manages her own medical care, including managing her daily medications, and she can navigate her home and community safely and independently. She can also do things like drive, shop, and travel back and forth to Minnesota to visit family and to attend

craft shows. (E.g., Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4).

(*Id.* at 20.)

The ALJ also thoroughly addressed Claimant's medical history:

> The record also supports the limitations in the RFC finding and is not entirely consistent with the claimant's allegations. The claimant underwent cardiology evaluations in June 2018 and October 2018; rheumatology evaluation in January 2019, December 2020, and March 2021; and orthopedic evaluation in July 2020 with complaints similar to her most recent complaints. (*See, e.g.,* Ex's 5F, 15F/681, 691). Yet, throughout this period, she engaged in SGA in a job she performed at the light exertional level despite her symptoms, as outlined above.
>
> The claimant has also undergone a wide array of diagnostic laboratory tests, the majority of which are unremarkable. No acute cardiopulmonary abnormalities are present on chest x-rays, and an echocardiogram identified no significant valvular disease, an ejection fraction of 55-60%, and normal left ventricular systolic function. (Ex's 14F/22, 15F/351-52, 389-91, 433-34, 447-49, 505-08; *see* Ex. 31F/2). A Lexiscan stress test was "normal" with no evidence of prior infarct or ischemia. (Ex. 15F/376). A colonoscopy with biopsy and an EGD were largely unremarkable. (Ex. 15F/364-69, 511-12, 523, 534-35). Multiple CT scans of the abdomen/pelvis identified no acute abnormalities, normal kidneys, and mild spondylosis. (Ex. 15F/388-89, 422-25 (noting hepatomegaly), 454-57). An abdominal ultrasound was unremarkable. (Ex. 15F/395-96). Abdominal x-ray was normal. (Ex. 15F/462-63). Pulmonary function testing performed in December 2022 was normal. (Ex. 15F/602). A CT scan of the head was normal. (Ex's 15F/440-41, 17F/14). Magnetic resonance cholangiopancreatography (MRCP) was normal. (Ex. 15F/451-52).
>
> Lumbopelvic x-rays taken in July 2024 identified moderate to severe decreased disc space at T12-L3 with associated small osteophytosis noted on the anterior endplates at L1-L2, mild to moderate decreased disc space at L3-S1 with associated small osteophytosis noted off the anterior endplates of L3-L5, moderate zygapophyseal joint subchondral sclerosis and joint margin osteophytosis involving the L4-S1 posterior joints, and moderate

degeneration of the bilateral sacroiliac joints. (Ex. 30F/7). An August 2024 MRI of the lumbar spine identified degenerative changes, including a moderate-sized disc herniation at L2-L3, a small right foraminal/ extraforaminal disc-osteophyte complex with annular fissure at L3-L4, a mild central posterior disc protrusion with annular fissure at L4-L5, and a small-moderate central posterior disc protrusion with mild posterior annular fissuring at L5-S1 and mild bilateral compression of the S1 nerve root. (Ex. 29F/4-5). These findings are consistent with back pain that radiates into the lower right extremity, primarily. (*See, e.g.,* Ex's 22F, 28F, 30F).

However, earlier back x-rays identified "mild degenerative disc disease." (Ex. 28F/1). Additionally, there is no evidence of neuroforaminal stenosis other than mild right narrowing at L2-3, vertebral body heights are maintained, and there is no lumbar spine listhesis. (Ex. 29F/4- 5). Moreover, x-rays of the hips identified only mild osteoarthritis in the sacroiliac joints. (Ex. 22F/3). Additionally, x-rays of the claimant's knees identified mild degenerative joint disease with preserved joint spaces. (Ex. 15F/417-18).

X-rays of the left hand identified stable erosive osteoarthritis at the distal interphalangeal joint of the index finger. (Ex. 14F/5, 32). X-rays of the right hand identified stable, early erosive osteoarthritis limited to one joint in the little ("pinky") finger. (Ex. 14F/5, 32). More recent x-rays of the right hand continue to reflect mild abnormalities, which is inconsistent with the claimant's allegations regarding use of her hand and with her testimony that arthritis affects all four fingers on her right and that her fingers are bent and twisting. (Ex. 15F/350-51). These x-rays are also inconsistent with the claimant's testimony that she has arthritis in both thumbs. X-rays of the right foot are also normal with the exception of plantar spurring and "scattered degenerative changes." (Ex. 15F/431-32).

Examinations are often unremarkable as well, with the claimant appearing in no acute distress with clear lungs, normal cardiovascular sounds, nontender abdomen without hepatosplenomegaly, no joint warmth or deformity, no focal neurologic deficits, nontender spine, no atrophy, full active ranges of motion, normal gait, normal deep tendon reflexes, no sensory or motor deficits, normal strength and tone, no dactylitis, and no adenopathy. (*See, e.g.,* Ex's 9F/56-57, 97 & 174, 14F/41, 15F/11-12, 16-17 & 609-10, 17F/4, 8 & 11, 22F/28 & 39, 25F/4, 30F/3, 31F/4; *cf.* Ex.

30F/8 (noting "signs and symptoms of neurogenic claudication")). This evidence is not consistent with the claimant's testimony that, for example, she is weak, that she drops things, that she has balance issues, and that she experiences a lot of swelling.

Rheumatology examination identifies "Heberden's nodes with some Bouchard's nodes in [the] hands," but "no synovitis in the hand joints." (Ex. 15F/563). Some examinations reflect as many as 12 out of 18 tender points, consistent with fibromyalgia, but other exams reflect fewer. (*E.g.,* Ex's 15F/563, 14F/41 (noting 5/18 tender points), 6F/6 (noting 3/18 tender points)). Similarly, even when she displayed symptoms of neurogenic claudication upon examination, including positive straight leg raise on the right, her gait and stance were normal, and she remained in no acute distress. (Ex. 30F/7-8). Although she testified to numbness in her legs, examinations often show no numbness along with no tactile dysesthesia/hyperesthesia. (Ex. 30F/3).

Exams of the knees show joint line tenderness, but negative varus and valgus stress test and full strength. (Ex's 15F/137 & 609-10, 21F). Even after a fall, an examination was unremarkable. (Ex. 15F/672-73). The claimant's allegations of limited use of her hands is not entirely consistent with this evidence, including examinations showing mild joint/hand tenderness and good range of motion in both shoulders. (Ex. 14F/41; *see also* Ex. 30F/3). She also used her hands for things like crafts. (*E.g.,* Ex's 22F/36 (traveling to a craft show), 24F/10).

A history of asthma is also present with treatment consisting of Symbicort and albuterol several times a day. (*E.g.,* Ex's 9F/54, 15F/16, 17F/5 ("mild intermittent asthma without complication")). However, asthma is generally under good control, and the claimant rarely sought treatment for respiratory emergencies. Likewise, examinations consistently reflected clear lungs without use of accessory muscles and without rhales, rhonchi, or wheezing. (*See, e.g.,* Ex's 14F/41, 15F/11-12, 16-17 & 609-10, 17F/88, 22F/28 & 39, 31F/4).

Treatment has also been conservative, consisting primarily of medication management along with other recommended treatment modalities such as Voltaren gel, heat, stretching, Tylenol, ibuprofen, a back brace, and aquatic

therapy. (*See, e.g.,* Ex's 6F/11, 15F/10-11, 564, 24F, 28F/3, 32F/8). She did not require hospitalization or invasive procedures.

I also note that the claimant alleged "constant pain" and "debilitating" headaches at the initial level, but then alleged her "pain and symptoms" had gotten worse by the hearing level. (Ex's 2E, 11E). Yet, examination signs, laboratory findings, and treatment remained largely consistent throughout the record, which is not consistent with allegations of steadily worsening symptoms.

The claimant was also diagnosed with mental impairments, but symptomatology was mild-tomoderate. A medical history of chronic anxiety and depression is noted with treatment consisting of individual therapy and medication such as Lexapro, which is prescribed throughout the relevant period. (*E.g.,* Ex's 3F, 9F/248, 17F, 22F, 24F). Symptoms included low mood, tearfulness, decreased motivation, anhedonia, decreased concentration (overlapped with brain fog associated with fibromyalgia), and ruminating thoughts. (*E.g.,* Ex's 2E, 7E, 11E, 9F, 13F, 15F, 22F, 24F, 26F).

However, the claimant engaged in SGA despite this history, as outlined above. Additionally, psychiatric observations were consistently normal or mildly abnormal, and mental status examination findings were often unremarkable:

> Patient is alert and oriented to person, place, and time. Appearance is within normal limits. Eye contact is good. Her rate of speech is normal. Speech volume is normal. Content of speech is appropriate. Patient's thought process is intact. Thought content is appropriate. No suicidal ideations or homicidal ideations. Hallucinations are not apparent. Delusions are not apparent. Insight is good. Judgment is good. Good concentration. Fund of knowledge is good. Her mood is anxious and depressed. Affect is consistent with mood and pleasant.

(Ex. 22F/6; *see also* Ex's 9F/249, 17F/4 & 8, 24F/27, 25F/4, 26F/10 & 17 (describing symptoms as "tolerable"), 31F/4). She denies panic attacks and reports that her activities are primarily limited by her physical health

issues. (*See, e.g.,* Ex. 26F/13). Symptoms were also well-controlled with Lexapro. (*E.g.,* Ex. 17F/89).

(*Id.* at 23-26.) Regarding Claimant's medical history, the ALJ concluded that:

> Overall, considering the entire record, I find the record supports the limitations in the RFC finding, but no additional limitations, and allegations to the contrary are not well-supported. Evidence of degenerative changes in the lumbar spine in conjunction with osteoarthritis, asthma, obesity, and fibromyalgia supports limiting the claimant to light work with reduced postural activities to avoid exacerbating her symptoms and with no exposure to hazards to avoid workplace injuries in the event of acute symptoms. Evidence of fibromyalgia and osteoarthritis in a few joints of the hands supports limiting her to frequent handling and fingering. Evidence of ongoing depressive and anxiety symptoms, which are heightened around other people and when under stress, along with difficulty concentrating, supports limiting the claimant to simple instructions with occasional interaction with coworkers and supervisors, and no interaction with the public in the performance of her job duties.

(*Id.* at 27.)

The ALJ addressed Dr. Freeman's opinions as follows:

> Dr. Freeman's opinion is persuasive in part. (Ex. 13F). It is supported by a thorough psychological evaluation, a detailed written report, a function-by-function assessment, and signs on examination such as good performance on tasks involving cognition, concentration, and memory. However, supportability is reduced by use of vague, nonfunctional language, such as "may" and "some," which does not adequately articulate the limitation for use in a residual functional capacity finding. The opinion is also only partly consistent with the record. Dr. Freeman's opinion that the claimant essentially has no limitations in performing tasks, including complex tasks, is not consistent with evidence of rumination, depression, and difficulty concentrating. However, her opinion is consistent with other evidence in the record, including signs on examination such as good performance on tasks involving cognition, concentration, and memory. It is also largely consistent with the claimant's ability to do things like care for herself independently, care for her son, drive, shop, operate basic household appliances, manage her own medical care, and complete forms

> as necessary. (*E.g.,* Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4).

(*Id.* at 28.)

The ALJ also addressed the opinions of the state agency psychological consultants:

> The prior administrative medical findings of Drs. Brandon and Tirado are persuasive because they are well-supported and consistent with the record. (Ex's 2, 3A). They are supported by longitudinal assessments of documentary evidence, written narratives, and function-by-function assessments of specific work-related activities. The findings are also consistent with the record, including a conservative mental health treatment history with good response to medication, many normal or mildly abnormal psychological statuses and mental status examinations, Dr. Freeman's report, and the claimant's ability to do things like care for herself independently, care for her son, drive, shop, operate basic household appliances, manage her own medical care, and complete forms as necessary. (*E.g.,* Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4). However, some of the language used in the prior administrative medical findings - such as limited public contact - is not vocationally defined, and thus, does not adequately articulate the limitation for use in a residual functional capacity finding. This finding is persuasive only insofar as it indicates that there are indeed limitations in the areas of: understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing oneself. I have used more specific, vocationally defined, and policy compliant language to express the moderate limitations arising from the claimant's mental impairments, as set forth in the RFC finding above.

(*Id.*)

Based on the foregoing, I find that the ALJ both properly considered Dr. Freeman's opinions and properly addressed the consistency and supportability of Dr. Freemans's opinions. The ALJ also properly supported her conclusions that Dr. Freeman's opinions were not fully consistent with the record as a whole and were not adequately supported by objective medical findings in the record. Even if different

conclusions could be drawn on this issue, the conclusions of the ALJ should be upheld because they are supported by substantial evidence on the record as a whole. *See Guilliams*, 393 F.3d at 801. It is not for this Court to reweigh evidence. Accordingly, I conclude that the ALJ properly evaluated Dr. Freeman's opinions.

The ALJ also addressed the opinions of Dr. Wallace, Ms.Stultz, Dr. Reid, and Ms. Dempewolf:

> Several medical sources completed Family and Medical Leave Act paperwork between January 2021 and August 2021, which contains opinion evidence. The opinions of Michael Wallace, M.D., Paula Stultz, A.R.N.P., Matthew Reid, D.O., and Anna Dempewolf, P.A.-C., are not persuasive. (Ex. 15F/644-52, 659-62 & 685-88). They are poorly supported in that they are conclusory and consist primarily of unexplained checkmarks without specific reference to objective signs and laboratory findings. They are also not supported by a longitudinal assessment of the record, and they are not supported by thorough function-by-function assessments. The opinions are also not entirely consistent with the record, including extensive laboratory findings explained above, mental, and physical signs upon exams, and the state agency consultants' findings. (*E.g.,* Ex's 4E, 6F, 9F/249, 13F, 17F/4, 8 & 89, 22F/6, 24F/27, 25F/4, 26F/10 & 17, 31F/4). I also note that statements about whether the claimant can perform past work, whether the claimant is or is not disabled, and whether the claimant can or cannot work at all, are inherently neither valuable nor persuasive. (20 CFR 404.1520b(c)(3)).

(AR at 28.) I find it significant that these opinions are in the context of FMLA leave and offered only snapshots of specific short time periods where Claimant needed short periods of time off work due to specific ailments, such as migraine headaches, a bacterial infection, a week-long episode of depression, and a fall resulting in pain to Claimant's chest. Furthermore, I find that the ALJ both properly considered these opinions and properly addressed the consistency and supportability of these opinions. The ALJ also properly supported her conclusions that these opinions were not consistent with the record as a whole and were not adequately supported by objective medical findings in the record.

Even if different conclusions could be drawn on this issue, the conclusions of the ALJ should be upheld because they are supported by substantial evidence on the record as a whole. *See Guilliams*, 393 F.3d at 801. It is not for this Court to reweigh evidence. Accordingly, I conclude that the ALJ properly evaluated these opinions.

Turning to the ALJ's credibility determination, the ALJ determined that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(AR at 23.) The ALJ also addressed Claimant's pain levels (AR at 24-25), effectiveness of medications (*id.* at 25-26), and precipitating and aggravating factors (*id.* at 23-26). Furthermore, the ALJ addressed Claimant's activities of daily living:

> In addition, despite her symptoms, the claimant was able to complete a wide range of activities of daily living independently, including caring for her son and traveling to craft shows, and cognition is intact, as noted at the consultative examination. (*E.g.,* Ex's 13F, 22F/1 & 36). The claimant independently manages personal care within her physical means, prepares simple meals, does light household chores, drives, goes out alone, shops in stores and by computer, socializes, gets along with others, and pays attention. (Ex. 4E). She reports difficulty with concentration and with managing stress and changes in routine. The claimant reported that she could not manage money, but a third-party indicated she does manage money. (*Compare* Ex. 4E, *with* Ex. 5E). She also mowed grass. (Ex. 26F).

(*Id.* at 27.) The ALJ also addressed third-party statements in considering Claimant's subjective allegations:

> In evaluating the claimant's statements regarding the intensity and persistence of symptoms, I considered the third-party statement completed by the claimant's mother per Social Security Ruling 16-3p. (Ex. 5E). However, such evidence is "evidence from non-medical sources" and we

> are not required to articulate how we considered evidence from nonmedical sources beyond assessing consistency. In this regard, the statements are not entirely consistent with the objective medical evidence. I also note that the mother saw the claimant frequently and was unable to answer many questions due to lack of familiarity with the claimant's daily activities. (*See* 20 CFR 404.1513(a)(4), 404.1520c(d)).

(*Id.* at 29.)

Based on the foregoing, it is clear from the ALJ's decision that she considered and addressed the *Polaski* and SSR 16-3p factors in determining that Claimant's subjective allegations of disability and the testimony of her witnesses were not fully credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Claimant's subjective complaints, I find that the ALJ's credibility determination should not be disturbed. *See Johnson*, 240 F.3d at 1148.

In determining Claimant's RFC, the ALJ addressed and considered Claimant's medical history and treatment for her complaints. (AR at 23-29.) The ALJ also properly considered and discussed Claimant's subjective allegations of disability in making her overall disability determination, including determining Claimant's RFC, finding that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.* at 23.)

Therefore, having reviewed the entire record, I find that the ALJ properly considered Claimant's medical records, observations of treating physicians, and

Claimant's own description of her limitations in making the ALJ's RFC assessment for Claimant. *See Lacroix*, 465 F.3d at 887. Further, I find that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618; *see also Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) ("[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (alteration in original) (citation omitted)."). Because the ALJ considered the medical evidence as a whole, I conclude that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803.

Accordingly, based on the foregoing, I recommend that the District Court affirm the ALJ's decision.

## *IV. CONCLUSION*

For the foregoing reasons, I respectfully recommend that the District Court **AFFIRM** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to de novo review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 21st day of September, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa